IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,

v.

KENAN THOMAS,

           Defendant.

Crim. Case No. 20-39

## UNITED STATES' SUPPLEMENTAL BRIEF

The United States of America, through Delia L. Smith, United States Attorney for the District of the Virgin Islands, and the undersigned Assistant United States Attorney, hereby files this supplemental brief in response to the questions posed in the Court's February 9, 2024, Order, docketed at ECF No. 261.

1. In *Heller*, the Supreme Court stated its decision should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Third Circuit has previously held that *Heller*'s assurance regarding felon in possession statutes "is not dicta" and is, therefore, a binding limitation on this Court. *United States v. Barton*, 633 F.3d 168, 171-72 (3d Cir. 2011). Given that a majority of the justices in *Bruen* reiterated that the Court's decision in that case continued to cast no doubt on the presumptive lawfulness of felon in possession laws, is the Court not still bound by that precedent to find 18 U.S.C. 922(g)(1) facially constitutional regardless of whether a *Bruen* analysis might indicate that section 922(g)(1) is inconsistent with the Nation's history and tradition of firearm regulation?

Yes, the Court is still bound by *Barton* and, applying *Barton*, this Court should hold that 18 U.S.C. § 922(g)(1) is facially constitutional. As noted, in *Bruen* itself, six justices took pains to stress that they were not casting doubt on the language in *Heller*. So *Bruen* itself provides no basis for re-examining *Barton*.

There is some tension between *Barton* and some statements in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc): (1) the holding that the Supreme Court's references to "law,

1

abiding responsible citizens" "were dicta," 69 F.4th at 101; (2) the rejection of § 922(g)(1) as a "longstanding" prohibition, at least as applied to nonviolent felons, given that it was not adopted until 1961, *id.* at 104; and (3) its statement that it was "dubious" that a federal prohibition on possession by "*violent* criminals," which dated back to 1938, would be "'longstanding' enough to warrant *Heller*'s assurance," *id.* But in *Range*, the en banc Third Circuit addressed an as-applied challenge, not a facial challenge, and did not directly supersede *Barton*'s holding that *Heller*'s statements about "longstanding prohibitions on the possession of firearms by felons" were "not dicta." For that reason, as one district court recently explained, this Court cannot rely on *Range* to set aside the holding in *Barton* and must reject any facial challenge to § 922(g)(1):

> [T]he majority and concurring opinions in *Range* made clear that their decision was narrowly tailored to as-applied challenges of § 922(g)(1). The Circuit Court did not hold that § 922(g)(1) is unconstitutional on its face and instead was careful to instruct that the statute remained facially constitutional at this time. *See Range*, 69 F.4th at 106 ("Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a).") (Hardiman, J., majority); *id.* at 109 (Government's failure to carry its burden in this case "does not spell doom for § 922(g)(1)" and the statute remains " 'presumptively lawful' ") (Ambro, J., concurring). Thus, this Court remains bound by the Supreme Court's decision in *Heller* and its progeny and Defendant's motion based on the facial constitutionality of § 922(g)(1) will be denied.

*United States v. Williams*, No. 3:21-CR-34, 2024 WL 665851, at *9 (M.D. Pa. Feb. 16, 2024) (footnote removed). [1]

2. **Does 18 U.S.C. § 922(g)(1) address a general societal problem that has persisted since the 18th century, or does it seek to address a modern problem that was unimaginable at the founding?**

---

[1] The Government also notes, for preservation purposes, that it continues to believe *Range* was wrongly decided. *See* Petition for Certiorari, *Garland v. Range*, No. 23-374.

2

Section 922(g)(1) addresses a societal problem—the danger presented by armed felons—that did not exist to the same degree at the time of the founding. Capital punishment and forfeiture of estate were commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment). And although a fairly large percentage of defendants who received death sentences were not actually executed, *see* Stuart Banner, *The Death Penalty: An American History* 54 (2002), the existence of the death penalty meant that many of the most dangerous felons never had the chance to possess firearms after conviction.

Additionally, firearms at the time of the founding did not present the same threat that the do today. Guns in the 18th century generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, *Why Guns Are and Are Not the Problem*, in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological developments in the 1800s—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to the increased use of guns in homicides.[2] *Id.* at 123-27.

3. **Outside of capital punishment offense, is there a history and tradition in this country of permanently disarming individuals of all firearms?**

---

[2] The Government notes that, when the issue was raised at a hearing, it had contended that the interstate commerce in firearms might provide a basis for holding that § 922(g)(1) addresses a modern problem. That argument was made in good faith based on the Government's awareness of colonial statutes that banned the intercolonial transfer of firearms. *See, e.g.*, *Teixeira v. City of Alameda*, 873 F.3d 670, 685, 698 (9th Cir. 2017) (citing Connecticut and Virginia laws). However, the Government no longer presses that argument as it appears that most firearms were imported from Europe during the colonial era.

As a preliminary matter, the Government notes that the inquiry for an as-applied challenge should be focused on the length of time from disarmament to the charged conduct, and thus any inquiry into permanent deprivation would, at most, only be relevant to a facial challenge (for which capital punishment offenses must be considered)—which *Barton* precludes for the reasons stated in response to the Court's first question. That said, the laws that disarmed Loyalists during the American Revolution theoretically could have been permanent if the persons subject to disarmament refused to swear a loyalty oath. But the Government is unaware of those laws continuing to be enforced after the American Revolution. The only other laws that were "permanent" in a sense were the laws prohibiting enslaved people from possessing firearms without their masters' permission. However, enslaved people who gained their freedom would no longer have been subject to those laws.

**4. Does the prospect of potentially receiving a pardon obviate the need for the Government to provide a historical analogue of permanent disarmament?**

Section 922(g)(1) is constitutional regardless of whether the government can identify a historical analogue involving permanent disarmament. *Bruen* requires a "historical analogue," not a "historical *twin*." 597 U.S. at 30. And there is no constitutional right to a pardon as a form of executive clemency. So historical laws depriving lawbreakers and irresponsible people of firearms would be sufficiently analogous to § 922(g)(1) whether or not there was a possibility of receiving a pardon. Nevertheless, the fact that Section 922(g)(1) does not apply to prior convictions that have "been expunged, or set aside or for which a person has had civil rights restored," 18 U.S.C. § 921(a)(20), indicates that the statute is not necessarily a "permanent" bar to firearm possession.

**5. Without considering the length of the disarmament, why are statutes disarming individuals thought to be dangerous an appropriate or inappropriate historical analogue to 18 U.S.C. 922(g)(1)?**

4

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Common sense suggests that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments), cert. denied, 582 U.S. 943 (2017); see *id.* at 400 n.160 (collecting studies). And the Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); see, *e.g.*, *Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

As the Eighth Circuit has explained, Section 922(g)(1)'s "prohibition on possession by convicted felons still passes muster under historical analysis" if the focus is on the "risk of dangerousness." *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023). "Not all persons disarmed under historical precedents . . . were violent or dangerous persons." *Id.* "But if dangerousness is considered the traditional *sine qua non* for dispossession, then history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* Instead, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.*

5

Indeed, to clarify, when the Government uses the term "dangerousness," it uses it to specifically address a risk of danger with firearms. As the Solicitor General explained during the oral argument in *Rahimi*, a person who is dangerous is a person "whose possession of firearms presents an unusual danger beyond the ordinary citizen."[3] *Oral Argument Transcript – United States v. Rahimi*, No. 22-915 (S.Ct.), at 11.

6. **Given that the Third Circuit's decision in *Lara* has limited the relevant time period the Government may consider when identifying historical analogues, does the Government still have enough examples of the disarmament of felon or similar similarly situated people to show that 18 U.S.C. § 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation?**

Post-*Lara*, the government can show that Section 922(g)(1) is consistent with the historical tradition of firearm regulation. *Lara* held that "the Second Amendment should be understood according to its public meaning in 1791" and it "set aside . . . statutes from the mid-to-late nineteenth century." *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2023). In the Government's view, *Lara* is wrong to conclude that legislation from the mid-to-late nineteenth century is irrelevant, particularly where that legislation simply confirms the historical understanding from at or near the time of the founding. But even without considering legislation from the mid-nineteenth century and beyond, Section 922(g)(1) accords with the historical tradition that includes English laws, the common law, and various colonial and early state laws—all preceding the 1791 enactment of the Second Amendment or dating less than 50 years after its enactment.

---

[3] For that reason, the defendant's decision to possess a firearm illegally, without seeking an advance court determination regarding constitutionality and disregarding firearms laws and court process —unlike the plaintiff in *Range's* approach—is another important factor signaling the defendant's dangerousness.

For example, in England, a 17th century statute empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms. Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms," 95 Notre Dame L. Rev. 397, 405 (2019).

Colonial and early state legislatures likewise disarmed individuals who "posed a potential danger" to others. *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012). Some early laws categorically disarmed entire groups deemed dangerous or untrustworthy, such as those who refused to swear allegiance. *Id.*; *see, e.g.*, Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), reprinted in 9 William Waller Hening, The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619, at 281-83 (1821). Other laws called for case-by-case judgments about dangerousness. *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess"). Still other laws disarmed individuals who had demonstrated their dangerousness by engaging in particular types of conduct, such as carrying arms in a manner that spreads fear or terror among the people. *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11-12; Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15.

Even the *Range* court recognized that "Founding-era governments disarmed groups they distrusted," such as "Loyalists" and religious dissenters. 69 F.4th at 105. These were people "who, the political majority believed, would threaten the orderly functioning of society if they were armed." *Id.* at 111 (Ambro, J., concurring).

Precursors to the Second Amendment proposed in the state ratifying conventions likewise suggest that legislatures may disarm certain categories of individuals, including those who are dangerous. A proposal presented at the Pennsylvania ratifying convention, for instance, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added). A proposal presented by Samuel Adams at the Massachusetts ratifying convention likewise provided that Congress may not "prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Id*. at 681 (emphasis added).

Post-ratification practice points in the same direction. Less than fifty years after the ratification of the Second Amendment in 1791, states enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see, e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840). Those statutes show that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to firearm restrictions that did not apply to others. *Bruen*, 142 S. Ct. at 2148-49. Or as one early scholar wrote, the Government may properly restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).

Under these circumstances, post-*Lara*, the Government still has enough examples of the disarmament of felon or similar similarly situated people to show that 18 U.S.C. § 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation.

**SUPPLEMENTAL AUTHORITY**

The Court indicated in its order that the parties should only file supplemental authorities from the Third Circuit and the Supreme Court. After the entry of the Court's order, the Third Circuit issued a non-precedential decision rejecting a challenge to 18 U.S.C. § 922(g)(1) on plain error review, but holding that there was no error, indicating that the decisions reading *Range* broadly—to those unlike the plaintiff in *Range*—are incorrect:

> Fifth, Hall argues that the Second Amendment bars punishing him for carrying a gun. He cites our recent en banc decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023). But *Range* involved an as-applied challenge to 18 U.S.C. § 924(g)(1) by someone with a single, decades-old conviction of minor welfare fraud. *Id.* at 98–99. Nothing in that decision suggests that it applies to someone with Hall's long, serious criminal history. We see no error, certainly not a plain one.

*United States v. Hall*, No. 23-1430, 2024 WL 510512, at *2 (3d Cir. Feb. 9, 2024).

                                      Respectfully submitted,

                                      DELIA L. SMITH
                                      UNITED STATES ATTORNEY

Dated: February 23, 2024         By:    *s/ Kyle Payne*
                                                    Kye Payne, Assistant United States Attorney
                                                    District of the Virgin Islands
                                                    5500 Veteran's Drive, Suite 260
                                                    St. Thomas, VI 00802
                                                    (340) 774-5757