**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS & ST. JOHN**

**\* \* \***

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 2020-39 |
| v. | ) | |
| | ) | |
| KENAN THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SECOND SUPPLEMENT TO MOTION FOR RECONSIDERATION OF MOTION
TO DISMISS COUTNS 2-9  UNDER THE SECOND AMENDMENT**

Kenan Thomas, through undersigned counsel Kia Sears, Esq, Assistant Federal Defender,

supplements his motion to dismiss by providing the follow response to the Court's Order found at

ECF #261.

### 1. Court not bound by Heller because presumptions can be rebutted

The Court is not bound by a Third Circuit opinion that pre-dated *Bruen, Range*, and *Lara.*

Additionally, the Court is not bound by comments by the justices that *Bruen* does not cast doubt on

the presumptive lawlessness of felon in possession statutes when they are unaccompanied by any

historical analysis. As the Third Circuit acknowledged in *Range v. Att'y General Untied States of Am.*, 69

F.4ᵗʰ 96, 103 fn. 7 (3d Cir. 2023), the *Heller* court "cited no such 'longstanding prohibitions',

presumably because they did 'not undertake an exhaustive historical analysis…of the full scope of the

Second Amendment."

*Bruen* held that the "only" way to validate a gun law is through text and history. 597 U.S. 1, 17,

24, 34 (2022). Any suggestion that the *Heller* list is exempt from the text-and-history test runs headlong

into *Bruen* itself. In the sentence before its reference to "longstanding prohibitions" on felons'

possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). Fourteen years later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the concealed carry of firearms in public—another of the "presumptively lawful" measures identified in *Heller. See United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons."). If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s approval of such laws and upheld New York's statute on that basis. Yet, far from placing New York's concealed-carry prohibition above constitutional scrutiny, the Supreme Court undertook a full textual and historical analysis, then struck down the law. *Bruen*, 596 U.S. at 8.

*Bruen* also applied the text-and-history test on another item on the "presumptively lawful" list, confirming that these laws are not exempt. The Court found that by "expanding the category of 'sensitive places' to all places of public congregation that are not isolated from law enforcement," New York "define[d] the category of 'sensitive places' far too broadly." *Id.* at 30-31.

Because the Third Circuit did not employ the text-and-history test, its holding in *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) does not survive *Bruen*. As stated by Circuit Judge Ambro in his concurrence joined by two other circuit court judges, "presumptions aren't rules, they can be rebutted." *Range* at 112. In the future, the Supreme Court will have to "square its history-driven test with its concurrent view that felon gun restrictions are presumptively lawful." *Id.* at 112-13. And, after performing the historical analysis, the Court may do away with its presumption that statutes prohibiting felons from possessing firearms are lawful. *Id.*

This Court cannot wait for the Supreme Court to revisit the presumption as it applies to felons. The Third Circuit questioned the strength of *Heller*'s presumption language in *Range*, saying it is a dubious proposition to claim the Federal Firearms Act of 1938 is "longstanding" enough to warrant *Heller*'s assurance given the time restrictions laid out in *Bruen*. *Id.* at 104. The Circuit went on in *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024), to establish that statutes enacted at least 50 years after the ratification of the Second Amendment could not be considered "longstanding".

This Court cannot, in the face of *Bruen*, *Range*, and *Lara*, uphold a firearms statute as constitutional by relying on precedent with stale or undeveloped propositions. Rather than treating *Heller*'s "longstanding prohibitions" passage as dispositive (or the justices' references to it in *Bruen)*, this Court must investigate the historical record to determine whether felon-disarmament laws are in fact consistent with the Second Amendment. Indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to concealed-carry bans in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. For felon-disarmament laws, by contrast, it cited no sources at all. *See id.* at 626-27. If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it necessarily follows that *Heller*'s cursory approval of felon-disarmament laws does not end the inquiry. Applying the standards laid out in *Bruen*, *Range*, and *Lara*, this Court must find the presumption that 922(g)(1) is lawful has been rebutted.

2. **Section 922(g)(1) addresses a problem that has persisted since the 18th century**

The Ninth Circuit found that general gun violence is a problem that persisted since the 18th century and thus a "distinctly similar" historical analogue was necessary. *See Baird v. Bonta*, 81 F.4[th] 1036, 1046 (9th Cir. 2023). This Court should find the same.

Anti-Federalists made proposals to disarm individuals for the commission of crimes. *See Range* at 126 (Krause, dissenting). However, those proposals were not incorporated into the Second

Amendment. Additionally, a problem is not unprecedented just because of changes in its severity or context. For example, the regulation in *Bruen* addressed the problem of "handgun violence," primarily in "urban areas." *Bruen* at 27 (simplified). The "degrees and types of risks" arising from that problem have evolved since the Founding as a result of, e.g., growing populations, urbanization, and technology. *Id.* at 91 (Breyer, J., dissenting). Yet the Supreme Court subjected New York's regulation to the straightforward inquiry for persistent problems. *Id.* at 26-29 (majority opinion).

Here, the "general societal problem" at which § 922(g)(1) is directed—i.e., felons' access to guns— "has persisted since the 18ᵗʰ century." *Id.* at 26. As such, the government must show a robust tradition of "distinctly similar" regulations.

3. **There is no tradition or history of permanently disarming individuals of all firearms**

Eliminate now-unconstitutional laws affecting groups with no right to bear arms, and few if any status-based restrictions remain. As one oft-cited historian concluded following a survey of founding-era session laws, "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic."[1] This "suggest[s] . . . that colonial and early national legislators did not see the regulation of gun ownership of citizens as a legitimate exercise of police power." *Id.* at 164–65 (emphasis added).

In the rare instances where colonial governments disarmed free, white men, they did so in an effort to confront perceived threats to the state. *Id.* at 155. However, these individuals were able to restore their rights to bear arms. Catholics could regain their arms if they were willing to swear undivided allegiance to the sovereign. *See United States v. Freeman,* 2023 WL 7325934 *7 (N.D. Ill. Nov. 7, 2023). Loyalists were able to regain their right to bear arms by taking an oath. *Id.* As it applied to

---

[1] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142 (2007) (emphases added).

those convicted of a crime, even if a weapon was forfeited, it did not affect the perpetrator's right to keep and bear other arms. *See Range*, 69 F.4ᵗʰ at 105. There is no tradition or history of permanently disarming individuals of all firearms.

### 4. The potential for receiving a pardon does not obviate government's need to find a historical analogue

"A pardon is an act of grace." *United States v. Wilson*, 32 U.S. 150, 160 (1833). "It is a check entrusted to the executive for special cases" to provide relief from "undue harshness or evident mistake in the operation or enforcement of the criminal law." *Ex parte Grossman*, 267 U.S. 87, 120-121 (1925). Pardons are, by design, not available to most convicted individuals, even if they do not reoffend. As such, the potential for a pardon does not obviate the government's need to find a historical analogue.

It is clear from a review of the government's own website at www.justice.gov that the vast majority of convicted felons will not be granted a pardon. First, the president cannot pardon a state criminal offense.[2] Second, individuals seeking a pardon must wait five years. *Id.* Third, pardons are ordinarily reserved for individuals who have accepted responsibility for the offense for which they have been convicted – thus those individuals who maintain their innocence are unlikely to receive a pardon. *Id.* Fourth, pardon applicants must submit their credit status, any pending civil lawsuits, and character references for consideration. *Id.*

The number of pardons granted during the past four presidencies demonstrates the limited disbursement of pardons. According to the Office of the Pardon Attorney, under George W. Bush, 2,498 individuals applied for a pardon and 189 pardons were granted – a granting rate of 7.5%.[3] Under

---

[2] Pardon Information and Instructions, U.S. Department of Justice, available online at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/pardon/file/977876/dl?inline.

[3] Office of the Pardon Attorney, U.S. Department of Justice, available online at https://www.justice.gov/pardon/clemency-statistics.

President Barack Obama, 3,395 individuals applied for a pardon and 212 petitions were granted – 6.2%. *Id.* When the president was Donald Trump, 1969 individuals applied for a pardon and 144 were granted – 7.3%. *Id.* Finally, under President Joseph Biden, to date, 925 pardon petitions have been received and only 13 have been granted – 1.4%. *Id.* In the past 20 years, less than 10% of individuals with convictions who applied for a presidential pardon were successful in obtaining one.

Furthermore, a felon did not have to seek a pardon in order to possess a firearm around the time of the ratification of the Second Amendment. To require those convicted of crimes with penalties greater than one year to successfully petition the President of the United States for grace and relief from undue harshness is too burdensome of a process for the restoration of a fundamental right.

5. **Statutes disarming individuals thought to be dangerous are inappropriate historical analogues**

Those previously thought to be dangerous were Loyalists, Native Americans, Quakers, Catholics, and Black individuals. *Range* at 104-05. These individuals were perceived to be dangerous, because they posed a "threat to the security of the state due to their perceived lack of loyalty or societal status." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023).

As an initial matter, as discussed in *Range,* the prior restrictions on firearms possession based on race and religion are unconstitutional. *Range* at 104. They were based on solely discriminatory purposes and "cannot impose a 'comparably justified' burden on the right of armed self-defense." *United States v. Taylor,* 2024 WL 245557 *5 (S.D. Ill. Jan. 22, 2024). Additionally, the Third Circuit has already found the past disarmament of distrusted groups is too broad to be an analogy. *Range* at 105. Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined." *Bruen* at 70. Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the right to keep and bear arms. *Id.* at 31.

These historical analogues are also inappropriate because they fail the "why" and "how" tests of *Bruen.* The dangerousness being protected against at the time of Founding was the potential for an

6

armed rebellion, not a threat to the general public safety. *See Rahimi* at 457. As the district court judge stated in *Williams v. Garland*, the regulated conduct in the old statute itself must be analogous to the conduct now before the court. 2023 WL 7646490 *4 (E.D. Pa Nov. 14, 2023). The regulated rebellious conduct of the past is not analogous to the aims of §922(g)(1). These prior statutes fail the "why" test under *Bruen*. *See LeBlanc*, 2023 WL 8756694 *11 (M.D. La Dec. 19, 2023).

As discussed in Section 3 above, Loyalists and religious minorities were able to regain their right to bear arms by taking a loyalty oath or pledging their allegiance to the sovereign. Enslaved people could possess firearms with the permission of their captors and Native Americans were permitted to possess firearms, just not purchase them. *See United States v. Freeman,* 2023 WL 7325934 *7 (N.D. Ill. Nov. 7, 2023). As found in *United States v. Prince*, there is no opportunity for felons to "regain their rights after demonstrating their ability to abide by the rule of law." 2023 WL 7220127 *9 (N.D. Ill. Nov. 2, 2023). These statutes disarming individuals thought to be dangerous also fail the test under *Bruen*'s "how" inquiry.

As counseled by the Third Circuit in *Lara*, courts must be "wary of a modern law that only 'remotely resembles a historical analogue' because to uphold such a law risks 'endorsing outliers that our ancestors would never have accepted.'" *Lara* at 129, citing *Bruen* at 2133. The statutes regarding "dangerous" groups are thus inappropriate historical analogues under *Bruen*.

6. **Government does not have enough examples of disarmament of felons given *Lara's* time period limitations**

The government has previously taken the position that there is no tradition or history of permanently disarming individuals with felony convictions. As discussed in *LeBlanc*, the government, in its brief submitted to the First Circuit Court of Appeals, stated that "18 U.S.C. 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time of the Second Amendment." 2023 WL 8756694 *7, citing *United States v. Pettengill*, 2011 WL 1977759 *27-28 (Gov.'s Br. May 13, 2011), quoting *United States v. Booker,* 644 F.3d 12, 24 (1st Cir. 2011). In an

7

argument to the Fourth Circuit Court of Appeals the government acknowledged that colonial societies did not appear to have categorically prohibited convicted criminals from owning firearms. *See id.*, citing *United States v. Staten*, 2011 WL 1542053 *25 (Gov.'s Br. Apr. 25, 2011). In *Staten*, the government went on to discuss how individuals who were not executed for their crimes were returned to society and sometimes required to arm themselves to protect against an Indian attack or slave revolt. 2011 WL 1542053 at 26.

The government's previous position is no surprise, since, as observed by Justice Barrett in *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019), "'at least thus far, scholars have not been able to identify' any Founding-era laws 'explicitly imposing – or explicitly authorizing the legislature to impose' permanent disarmament of all felons." *Leblanc,* at 7. While there were founding era laws that required forfeiture of the weapons used in the commission of crimes, those laws still permitted the perpetrators to keep and bear other arms. *See Range*, 69 F.4th at 105.

Further, the ban on firearms is not a form of punishment for the crime, but is instead a status-based ban. *Id.* at 105. There were no lifetime bans on firearms possession based on an individual's status as a felon. *Id.* at 105. As found in *Range*, the government has not provided "a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime." *Id.* at 105.

The laws the government has previously directed the Court's attention to after *Bruen* either predate the ratification of the Second Amendment and are thus ancient practices that were not accepted by the colonies or are too far removed from ratification of the Second Amendment as explained in *Lara*. The Third Circuit has reviewed the relevant history and, as Circuit Judge Shwartz stated in her dissenting opinion in *Range*, the historical analysis applied by the majority opinion "renders most, if not all, felon bans unconstitutional." *Range* at 113.

8

**<u>Conclusion</u>**

Given the Third Circuit's opinions in *Range and Lara*, the Court must grant Mr. Thomas'

motion to reconsider his motion to dismiss.

Dated: February 23, 2024

                                       Respectfully submitted,

                                       <u>s/ Kia D. Sears</u>
                                       KIA D. SEARS, ESQUIRE
                                       Assistant Federal Defender
                                       1336 Beltjen Gade, Suite 202
                                       St. Thomas, VI 00802
                                       Tel (340) 774-4449
                                       Fax (340) 776-7683
                                       E-mail: kia_sears@fd.org